**FLEXIBLE TECHNOLOGIES, INC., Plaintiff,**

v.

**WORLD TUBING CORPORATION, Defendant.**

No. CV 92 5143 (RJD).

United States District Court, E.D. New York.

Jan. 10, 1996.

Thomas O'Rourke, Wyatt, Gerber, Burke & Badie, New York City, for Plaintiff.

Stephen E. Skovron, Bochetto & Lentz, Philadelphia, Pennsylvania, for Defendant.

### MEMORANDUM & ORDER

DEARIE, District Judge.

Plaintiff Flexible Technologies, Inc. ("Flexible") seeks a preliminary injunction to prevent defendant World Tubing Corporation ("World Tubing") from shipping a hose-making machine, the focus of this litigation, to Scotland. World Tubing moves to transfer the case to the District of Connecticut where related litigation is now pending. The Court grants the preliminary injunction and transfers the action to the District of Connecticut.

### FACTS

This case involves allegations of theft of plaintiff's trade secrets and their mechanical embodiment by plaintiff's former employees. Plaintiff's suit in the District of Connecticut charges its former employees with misappropriating its trade secrets. Those individuals are the founders of World Tubing, the defendant in this action, and allegedly the beneficiary of the theft. Plaintiff sought injunctive relief in this Court upon learning that the machine allegedly built with stolen trade secrets was being shipped overseas for sale to a third party. Surprisingly, many facts are not in dispute.

Flexible is a South Carolina corporation that has manufactured vacuum hoses for over 40 years. During the 1950s, Marcus Hall, a defendant in the related action, worked for one of Flexible's predecessors in Connecticut. As part of his employment, Hall worked on developing hose-making machines. When the company relocated to South Carolina in the late 1950s, Hall stopped working for the company. Thereafter, Hall and Flexible entered into a series of consulting agreements under which Hall built hose-making machines exclusively for Flexible. The most recent of these agreements terminated on March 1, 1991. The agreements contained a confidentiality clause that provided, "Hall will not at any time during the term of this agreement or thereafter reveal to any person (unless previously authorized in writing by [Flexible]) any Confidential Information." Plaintiff's motion, Exhibit 5. In 1991, Hall declined to continue his consulting arrangement with Flexible.

World Tubing, a Canadian corporation with its principal place of business in Branford, Connecticut, is owned by four former Flexible employees, Marcus Hall, David Lawrence, Eckard Fahnrich, and Bruce Miller. David Lawrence, the president of World Tubing, was a sales representative for Flexible from 1977 until 1987. Bruce Miller was at one time the technical director of Flexible Ducting, Flexible's sister company in Great Britain, and Eckard Fahnrich was formerly employed by Flexible Ducting Limited, the German affiliate of Flexible Ducting.

After his consulting agreement with Flexible expired in March 1991, Hall built a hose-making machine for World Tubing. Flexible argues that this hose-making machine incorporates numerous trade secrets of Flexible. World Tubing maintains that Hall built the machine using expired patents and general engineering skills. Flexible counters that, in the thirty years since the patents were issued, no one else has made a similar hose-making machine. Flexible relies on the October 17, 1995 affidavit of its technical expert, John Cearny, in which he states that the World Tubing machine uses trade secrets of Flexible as described in his report dated May 17, 1995. Plaintiff's motion, Exhibit 2.

In that report, Cearny maintains that the expired patents do not provide sufficient detail for a third person to build a hose-making machine like Flexible's without the expenditure of substantial time, research, and expense unless the third person had prior knowledge of the Flexible machine. Plaintiff's motion, Exhibit 2 at 10–11. Cearny also concludes that it is highly unlikely that an experienced technical person "would independently develop certain required features utilized in the World Tubing Machine of such similarity to the Flexible Technologies machine, solely from a review and study of applicable patents." *Id.* At the time of his report, Cearny had not examined the World Tubing machine.

Flexible also relies on the deposition of one of its engineers, Dennis Simpson, who examined the World Tubing machine and concluded that numerous features of the machine reflect trade secrets of Flexible. Plaintiff's motion, Exhibit 11. In its response, World Tubing relies on a previous deposition of Simpson, apparently taken before Flexible's current counsel entered the case. In this deposition, Simpson conceded that an experienced engineer, using the expired patents and trial and error, "could" build the hose-making machine in ten months to a year. Defendant's opposition, Exhibit E at 54–55.

Flexible also relies on various portions of Hall's deposition. When Hall built hose-making machines for Flexible, he hired Harmon Scovil to produce the tips and cams of the mandrel for the machines. Hall stated that he hired Scovil to make the tips and cams for the World Tubing machine and conceded that Scovil was the logical person to go to because he had built the tips and cams for the Flexible machines. Plaintiff's motion, Exhibit 3 at 309–310.

Flexible understandably emphasizes that Hall travelled to Poland to inspect a machine that he had made earlier for Flexible. When asked why he went to Poland, Hall admitted, "We were about to consider making a machine for World Tubing and we wanted to look at the details of that machine." Plaintiff's motion, Exhibit 7 at 45–46. Significantly, Hall secured access to the machine in Poland apparently by misrepresenting to the Polish owner of the machine that he was licensed by Flexible Ducting. Zygmunt Marchlik, a mechanical engineer at the Polish company, stated in his deposition that, as far as he could remember, the World Tubing visitors told him that they were licensed by "the Flexi company." Plaintiff's motion, Exhibit 10. World Tubing does not deny these allegations. Flexible also alleges that Hall had drawings of its hose-making machine at the time he started to build a machine for World Tubing and that he did not return the drawings to Flexible until September 5, 1991, more than six months after the termination of the last consulting agreement between Hall and Flexible. Again, there is no denial.

On May 15, 1992, Flexible filed a breach of contract suit against Hall and Lawrence in federal district court in South Carolina, alleging breaches of confidentiality agreements. This action was subsequently transferred to the District of Connecticut. World Tubing is not a party to the Connecticut suit. On October 30, 1992, Flexible filed this action in the Eastern District of New York against World Tubing, asserting claims for trade dress infringement and false designation of origin under 15 U.S.C. § 1125(a). On January 23, 1993, World Tubing brought a counterclaim against Flexible in the New York action seeking a declaration that Flexible has no protectable trade secrets in the hose-making machine or the products made by the machine.

On October 17, 1995, Flexible moved this Court for a temporary restraining order enjoining World Tubing from shipping overseas and selling its hose-making machine. Flexible maintained that it had recently learned that World Tubing was planning to ship the machine to Primaflex Limited ("Primaflex") in Scotland and that the machine was going to be operational in Scotland by November 1, 1995. World Tubing argued that Flexible was not entitled to injunctive relief on the trade secrets issue because Flexible did not assert a trade secrets cause of action in its Eastern District complaint. Flexible responded that the trade secrets claim was brought into the litigation when World Tubing filed its counterclaim.

The Court granted a temporary restraining order on October 17, 1995. By letter dated October 24, 1995, World Tubing submitted an affidavit of its president, David Lawrence. Lawrence attested that World Tubing was not going to the sell the machine, that it was merely moving it to Scotland, that the machine would be stored and operated in a facility owned or leased by World Tubing, that World Tubing employees would operate the machine in Scotland (he stated that some of these employees might also be employed by Primaflex), and that the move was motivated solely to reduce labor costs by an estimated $200,000 a year. (The details of World Tubing's arrangement with Primaflex have yet to be precisely articulated.).

On October 25, 1995, World Tubing moved to dismiss its own counterclaim pursuant to Fed.R.Civ.P. 41(c). On October 30, 1995, Flexible opposed World Tubing's motion and sought leave to amend its complaint to assert a claim for misappropriation of trade secrets.

At oral argument on November 1, 1995 on plaintiff's preliminary injunction application, the case took a peculiar turn. Without notice to plaintiff's counsel, counsel for World Tubing tendered to the Court a proposed stipulation that would have permitted it to move the machine to any location on three conditions: that World Tubing would not sell, rent, or transfer the hose-making machine to any person or entity, that World Tubing would store and utilize the machine "in a space visually enclosed," and that World Tubing would not knowingly display the machine to any person not employed by World Tubing. World Tubing argued that the proposed stipulation would adequately address Flexible's concerns and make intervention by the Court unnecessary. World Tubing's unorthodox strategy did not satisfy Flexible, and it does not satisfy the Court.

By Order dated November 2, 1995, the Court granted Flexible leave to amend its complaint to assert a misappropriation of trade secrets cause of action, granted World Tubing's motion to dismiss its counterclaim, and ordered the parties to address any issues raised by the proposed stipulation. On November 2, 1995, World Tubing moved to transfer the case to the District of Connecticut in order to consolidate the case with the pending Connecticut action. On November 15, 1995, Flexible informed the Court that it had no objection to the transfer provided that the Court first rule on the preliminary injunction motion. The parties consented to the continuation of the temporary restraining order until the Court issues a decision in this case.

## DISCUSSION

### I. Preliminary Injunction

■ In order to prevail on a motion for a preliminary injunction, the moving party must establish (a) irreparable injury, and (b) either (i) a likelihood of success on the mer-

its, (ii) or a sufficiently serious question going to the merits and a balance of hardship tipping decidedly in favor in the moving party's favor. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). If money damages would be adequate compensation, a preliminary injunction will not issue. *Id.*

### A. Irreparable harm

■ A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990). In order to establish irreparable injury, the moving party must show that the injury is imminent, not remote or speculative. *Id.*

■ World Tubing asserts that Flexible cannot establish that it will suffer immediate, irreparable harm if the preliminary injunction is denied. World Tubing argues that Flexible learned in plaintiff's answer to the complaint that the hose-making machine was delivered to World Tubing's Branford, Connecticut premises in February 1992. World Tubing emphasizes that Flexible took no action to prevent World Tubing from selling or moving the machine until October 1995. World Tubing characterizes this conduct as dilatory and cites it as evidence that Flexible cannot show immediate, irreparable injury.

■ While an unexplained delay may be fatal to a claim of irreparable harm, and is always an important factor in determining the suitability of extraordinary relief, it is not necessarily so. *See, e.g., Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985) (holding that delay in seeking a preliminary injunction "may ... indicate an absence of the kind of irreparable harm required to support a preliminary injunction.") Delay may also suggest that the application is more a matter of tactic than need. Or it may not. In this case, the Court is not importuned by a dilatory litigant, but one who justifiably fears that meaningful relief under the changed circumstances mandates judicial intervention. If Flexible were seeking an injunction to prevent World Tubing from operating its hose-making machine, the Court

might agree that Flexible could not show immediate, irreparable harm because it waited three years before seeking such an injunction and because lost sales to a domestic competitor could be compensated in money damages. Flexible, however, is not seeking to enjoin the operation of the hose-making machine; rather, it seeks to prevent World Tubing from moving the hose-making machine out of the country. The Court notes that World Tubing's plan to move the machine overseas is a significant change of circumstance that would place the machine and its technical secrets effectively beyond the reach of this Court. In the context of this material change of circumstance, the elapsed three-year period is understandable, as is Flexible's heightened concern over the planned overseas shipment of the allegedly offending device.

World Tubing also argues that Flexible cannot establish irreparable harm because it has implicitly conceded that money damages are adequate. In its motion for a preliminary injunction, Flexible argues that Primaflex, the prospective recipient of the machine at one point, is not a profitable concern and attaches Primaflex's balance sheet as Exhibit 1. World Tubing argues that Flexible concedes that it would not seek injunctive relief if Primaflex was a profitable corporation. Although World Tubing is correct that a preliminary injunction will not issue where money damages will be adequate compensation, see *Jackson Dairy, Inc.,* 596 F.2d at 72, World Tubing reads too much into Flexible's statement concerning Primaflex's financial condition. Indeed, in its motion for a preliminary injunction, Flexible argues that, if the machine is shipped to Scotland, it will lose its trade secrets and a "damage remedy from World Tubing will not be able to compensate Flexible Technologies for its loss."

Courts have recognized that the loss of trade secrets constitutes irreparable harm because money damages are inadequate to compensate the loss. *See Computer Associates Int'l, Inc. v. Bryan,* 784 F.Supp. 982, 986 (E.D.N.Y.1992) (Spatt, J.) ("The loss of trade secrets is not measurable in terms of monetary damages ... [because] 'a trade secret once lost is, of course, lost forever and is thus considered irreparable harm.'") (citing *FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir.1984)). Because money damages would not compensate Flexible for the loss of its trade secrets, Flexible has established that it would suffer irreparable harm if the preliminary injunction were not granted.

■ World Tubing embraces its eleventh-hour proposed stipulation that it will not sell the machine or knowingly display it to third parties and argues that Flexible cannot establish irreparable harm. World Tubing's argument ignores the essence of the parties' disputes. Flexible seeks in effect to prevent the removal of the proceeds of the theft, the machine itself, from effective monitoring and control by this Court. The proposed stipulation would allow World Tubing to capitalize on its allegedly larcenous behavior. Under the proposed stipulation, World Tubing's employees would not be required to execute confidentiality agreements; therefore, these employees could convey Flexible's claimed trade secrets to third persons who are beyond the jurisdiction of the United States courts. The Court recognizes that World Tubing and its employees could engage in similar conduct in Connecticut. However, the Court finds that having the machine in this country, under the supervision of the federal courts, provides for the effective implementation of any order the Court might devise. In sum, the Court is convinced that Flexible has demonstrated that it will suffer immediate, irreparable harm if the preliminary injunction is denied.

### B. Likelihood of success on the merits and balance of hardships

■ To meet the second prong of the preliminary injunction standard by showing a likelihood of success on the merits, the "movant need not show that success is an absolute certainty. It need only be shown that the probability of the movant prevailing is better than fifty percent." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). To succeed on its misappropriation of trade secrets claim under New York law, Flexible must establish (1) that it possessed a trade secret, and (b) that World Tubing used the trade

secret in breach of an agreement, a confidential relationship, or as a result of discovery by improper means. *Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1176 (2d Cir.1993); *Integrated Cash Management Servs. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.1990).

■ Flexible has offered substantial evidence in support of its contention that World Tubing misappropriated its trade secrets in building its hose-making machine. This evidence includes Cearny's affidavit, Hall's deposition testimony that he hired Scovil because he had worked on the Flexible machines with him, Hall's deposition testimony describing his visit to Poland and his explanation for the trip that he "wanted to look at the details of that machine," the Polish engineer's deposition testimony that the World Tubing delegation misrepresented themselves as being licensed by Flexi, and Simpson's deposition testimony describing the similarities between the two machines. The Court has also had the opportunity to compare Flexible's and World Tubing's hoses. The striking similarity between the products cannot be denied, and it lends considerable weight to Flexible's claims. The Court finds that, at this stage in the proceedings, the available, credible evidence supports a strong inference that World Tubing misappropriated Flexible's trade secrets. Flexible has demonstrated a likelihood of success on the merits.

■ The Court also finds that the balance of hardships weighs decidedly in favor of Flexible. In the affidavit of its president, World Tubing states that it seeks to move the machine to Scotland in order to save labor costs. Flexible, on the other hand, asserts that the World Tubing machine incorporates its trade secrets and is about to be shipped out of the country. *See FMC Corp.,* 730 F.2d at 63 ("A trade secret once lost is, of course lost forever."). The case is ready to proceed to trial. A preliminary injunction will not impose an undue burden on World Tubing. Flexible's risk of losing forever its trade secrets clearly outweighs the inconvenience and additional costs imposed on World Tubing by granting the preliminary injunction. The Court therefore holds that the balance of hardships tips decidedly in favor of Flexible.

### C. Conclusion

Because Flexible has satisfied the requirements for a preliminary injunction, the Court grants the preliminary injunction.

## II. Motion to Transfer

■ World Tubing moves pursuant to 28 U.S.C. § 1404(a) to transfer this action to the District of Connecticut. Section 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The determination of whether to grant a motion to transfer under section 1404(a) is within the broad discretion of the district court. *Red Bull Assocs. v. Best Western Int'l, Inc.,* 862 F.2d 963, 967 (2d Cir.1988). The party seeking transfer bears the burden of establishing the propriety of a section 1404(a) transfer. *Barr Laboratories, Inc. v. Quantum Pharmics, Inc.,* 827 F.Supp. 111, 113 (E.D.N.Y.1993). To determine whether World Tubing has satisfied its burden, a district court should consider the following factors: (1) the convenience of the parties; (2) the convenience of material witnesses; (3) the availability of process to compel the presence of unwilling witnesses; (4) the cost of obtaining witnesses; (5) the relative ease of access to sources of proof; (6) where the events at issue took place; (7) the practical problems indicating where the case can be tried more expeditiously and inexpensively; and (8) the interests of justice in general. *Id.* After considering these factors and the fact that the plaintiff sensibly does not object to the transfer, the Court concludes that the action should be transferred to the District of Connecticut.

The Clerk of the Court is directed to transfer this action to the District of Connecticut.

SO ORDERED.